**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| JOHN L. PRISQUE, | : | CIVIL ACTION NO. 14-1213 (MLC) |
|  | : |  |
| Petitioner, | : | **MEMORANDUM OPINION** |
|  | : |  |
| v. | : |  |
|  | : |  |
| UNITED STATES OF AMERICA, | : |  |
|  | : |  |
| Respondent. | : |  |
|  | : |  |

**COOPER, District Judge**

This matter comes before the Court on the <u>pro se</u> motion of John L. Prisque ("Petitioner") to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. The underlying criminal case in this Court was <u>United States v. Atlantic States Cast Iron Pipe Company, et al.</u>, Crim. No. 03-852-02 (MLC), <u>aff'd sub nom.</u> <u>United States v. Maury</u>, 695 F.3d 227 (3d Cir. 2012), <u>cert. denied sub nom.</u> <u>Atl. States Cast Iron Pipe Co. v. United States</u>, 133 S.Ct. 1600 (2013).

Petitioner was the Plant Manager of the Atlantic States Cast Iron Pipe Company ("the Company") pipe foundry in Phillipsburg, New Jersey. He was convicted in a jury trial on six counts of a 34-count multi-defendant Superseding Indictment alleging conspiracy under 18 U.S.C. § 371 and various substantive counts. Specifically, his conviction was on all five alleged objects of the Count 1 conspiracy: to violate provisions of the federal Clean Water Act and Clean Air Act, to defraud the United States, to make

false statements, and to obstruct a proceeding of the Occupational Safety & Health

Administration ("OSHA").  He was also convicted of substantive counts alleging

obstruction of OSHA under 18 U.S.C. § 1505 (Counts 8 and 9); altering an object with

intent to obstruct OSHA under 18 U.S.C. § 1519 (Count 11); negligent violation of the

Clean Water Act, 33 U.S.C. §§ 1311(a) and 1319(c)(1)(A) (Count 27); and violation of

the Clean Air Act, 42 U.S.C. § 7413(c)(1) (Count 34).  His sentence of 70 months

imprisonment, with no term of supervised release or fine, was affirmed on direct appeal

and certiorari was denied.

This motion seeks to set aside Petitioner's conviction and/or modify his sentence

on grounds of ineffective assistance of trial counsel.  He asserts numerous claims

regarding his counsel's advice and representation.  Those claims are set forth in detail in

Section II.B. infra.  The claims may be summarized generally as follows:  (1) counsel

improperly advised Petitioner to waive any conflict of interest in having the Company, his

employer and co-defendant, provide defense counsel for him at company expense, and

therefore his waiver of that conflict on the record was not knowing and voluntary; (2)

counsel was generally inattentive to Petitioner's interests and was protective of the

interests of the co-defendant Company, which was paying for his defense; (3) counsel

failed to call certain individuals as defense witnesses, and failed to make certain

arguments at trial; (4) counsel failed to oppose the 4-level role enhancement found by the

Court in calculating Petitioner's guideline offense level; and (5) counsel failed to advise

Petitioner about his options other than going to trial, including cooperating against the interests of his employer in return for a lesser sentence, despite his numerous requests to counsel to take him to talk with the Government.  (Second Section 2255 Motion, Dkt. 17 at 4–19; see n.3 infra.)

Based upon our review of the motion papers and the relevant materials contained in the record of the underlying criminal case, this Court finds that the record must be expanded, and an evidentiary hearing may be required, on the last issue among the claims summarized above.  Therefore, we will appoint counsel for Petitioner to pursue that issue alone.  We further conclude that each of Petitioner's other claims should be adjudicated based upon the record in this motion and the extensive record in the underlying criminal case, and as to those claims the motion must be denied on the papers.  See Rules Governing Section 2255 Proceedings for U.S. District Courts ("Rule"), Rules 7 and 8; 18 U.S.C. § 3006A; United States v. Nahodil, 36 F.3d 323, 326 (3d Cir. 1994).

## I.  PROCEDURAL HISTORY

Atlantic States and five of its employees, including Petitioner, were charged in an indictment filed on December 11, 2003.  (Crim. Dkt. 1.)[1]  A superseding indictment was filed on September 14, 2004.  (Crim. Dkt. 95.)  After discovery and pretrial motion practice, the trial commenced on September 12, 2005.  (Crim. Dkt. 219.)  The jury

---

[1]  The docket filings in the underlying criminal case in this Court, Crim. No. 03-852, are voluminous.  Where those filings are cited in this opinion, we simply refer to the numbered docket entry as "Crim. Dkt."  The basic chronology of events in that case is found on the docket sheet and is not cited here except where necessary to provide appropriate detail.

verdict, rendered on April 26, 2006, found the Company and four of the individual

defendants guilty on various counts, while one individual defendant was acquitted.  The

verdict found Petitioner guilty on the six counts listed above.  (Crim. Dkt. 610.)

This Court denied Petitioner's motions for acquittal and for new trial under Federal

Rules of Criminal Procedure 29 and 33, in an opinion filed on August 2, 2007.  (Crim.

Dkt. 721.)  See United States v. Atl. States Cast Iron Pipe Co., 2007 WL 2282514 (D.N.J.

Aug. 2, 2007).  Petitioner's sentencing hearing was conducted on April 20, 2009.  (Crim.

Dkts. 610, 760.)  The other defendants who were found guilty, including the Company,

were also sentenced individually that week.  They all appealed, and the judgments of

conviction and sentences were affirmed in an opinion of the Court of Appeals filed on

September 17, 2012.  United States v. Maury, 695 F.3d 227 (3d Cir. 2012).  That opinion

gave this overview of the nature of the action:

> Following an eight-month criminal trial, a jury convicted Atlantic States Cast
> Iron Pipe Company and four of its managers of various crimes.  These
> included conspiring to commit a host of environmental pollution and worker
> safety violations, attempting to cover up or impede federal investigation of
> those violations, and substantive violations of the Clean Water Act and the
> Clean Air Act.  Specifically, the Defendants were found to have illegally
> pumped contaminated water into storm drains and, as a result, into the
> Delaware River; to have unlawfully burned 50-gallon drums of paint waste in
> a cupola and emitted the fumes from those activities into the air; and to have
> attempted to cover up several work-related accidents at its facility, one of
> which resulted in the death of an employee.  The jury also found that the
> Defendants engaged in a conspiracy to commit these acts – and to impede the
> resulting federal investigation – in order to maximize productivity and profits
> at the Plant.

Id. at 232–33.

4

The United States Supreme Court denied certiorari for Petitioner and the other appellants on March 18, 2013.  Atl. States Cast Iron Pipe Co. v. United States, 133 S.Ct. 1600 (2013).

Petitioner timely commenced this action with the filing of his original Section 2255 Motion on February 24, 2014.  (Dkt. 1.)[2]  This Court afforded notice to Petitioner pursuant to United States v. Miller, 197 F.3d 644 (3d Cir. 1999).  (Dkt. 2.)  In response to the Miller notice, Petitioner filed a second Section 2255 Motion (the "Petition") on April 7, 2014, and subsequently confirmed in a separate filing that it was the second motion that he intended to pursue.  (Dkt. 7 at 1–2.)[3]  This Court preliminarily reviewed the second Section 2255 Motion, pursuant to Rule 4(b), and entered an order directing the United States Attorney ("Respondent") to file an answer, allowing Petitioner leave to reply.  (Dkt. 8.)  Respondent filed its Answer (Dkt. 10); and Petitioner filed a reply brief with exhibits (Dkt. 13).

---

[2]  The docket filings in this Court on Petitioner's pending Section 2255 case, Civil No. 14-1213, are cited in this opinion as "Dkt."  This is to distinguish them from the filings in the underlying criminal action, cited here as "Crim. Dkt."  See n.1 supra.

[3]  The procedural steps that led to the filing of Petitioner's second Section 2255 Motion in this action were slightly indirect but did result in a valid filing of his second Section 2255 Motion, which we find to be timely under the one-year limitation period of 28 U.S.C. § 2255 para. 6.  (See Dkt. 6 (Second Miller Notice & Order ); Dkt. 7 (Petitioner's Response ); see also Second Section 2255 Motion [filed in a new docket, Civil No. 14-2199, but consolidated into this action by Order filed on May 14, 2014 (Dkt. 6)].)  We have directed the Clerk to re-file a copy of the second Section 2255 Motion on the docket of this action, for ease of citation.  (Dkts. 16, 17.)

## II.     DISCUSSION

### A.     Legal Framework

Under 28 U.S.C. § 2255:

> A prisoner in custody under sentence of a [federal] court . . . claiming the
> right to be released upon the ground that the sentence was imposed in
> violation of the Constitution or laws of the United States, or that the court
> was without jurisdiction to impose such sentence, or that the sentence was in
> excess of the maximum authorized by law, or is otherwise subject to
> collateral attack, may move the court which imposed the sentence to vacate,
> set aside or correct the sentence.

28 U.S.C. § 2255(a).

This Court has jurisdiction under 28 U.S.C. § 1331.  Petitioner has the burden of

establishing any claim asserted in the motion.  United States v. Abbott, 975 F.Supp. 703,

705 (E.D. Pa. 1997).

Section 2255 itself limits the discretion of a district court to deny a motion made

thereunder without a hearing:

> Unless the motion and the files and records of the case conclusively show
> that the prisoner is entitled to no relief, the court shall cause notice thereof to
> be served upon the United States attorney, grant a prompt hearing thereon,
> determine the issues and make findings of fact and conclusions of law with
> respect thereto.

28 U.S.C. § 2255(b) (emphasis added).

The duty of the district court under this provision has been described generally as

follows:

> When a motion is made under 28 U.S.C. § 2255 the question of whether to
> order a hearing is committed to the sound discretion of the district court.  In
> exercising that discretion the court must accept the truth of the movant's

6

> factual allegations unless they are clearly frivolous on the basis of the existing record.  Further, the court must order an evidentiary hearing to determine the facts unless the motion and files and records of the case show conclusively that the movant is not entitled to relief.

Gov't of V.I. v. Forte, 865 F.2d 59, 62 (3d Cir. 1989); see also Rule 8(a).  In deciding whether to conduct an evidentiary hearing, the court must accept the truth of a petitioner's non-frivolous factual allegations and examine them to see if those claims conclusively satisfy both prongs of the Strickland test, discussed infra.  The court, however, can reject clearly frivolous claims, Forte, 865 F.2d at 62, and can dispose of vague or conclusory assertions as insufficient.  Machibroda v. United States, 368 U.S. 487, 495–96 (1962); see also United States v. Dawson, 857 F.2d 923, 927–28 (3d Cir. 1988) (describing procedure for evaluating Strickland claims to determine whether hearing is necessary).

Petitioner asserts each of his claims under the theory of ineffective assistance of his trial counsel, raising allegations regarding his decision to go to trial, and his representation by counsel at trial and sentencing, citing Strickland v. Washington, 466 U.S. 668 (1984).  Petitioner's defense counsel of record throughout the proceedings in this Court, as well as on appeal, was Michael D. Critchley, Esq.  Mr. Critchley was assisted during the trial by his associate, Edmund DeNoia, Esq.  Here we summarize the general legal standards that apply to such claims.

The Sixth Amendment provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  "A defendant has a Sixth Amendment right not just to counsel, but to

'reasonably effective assistance' of counsel." <u>United States v. Day</u>, 969 F.2d 39, 42 (3d Cir. 1992) (quoting <u>Strickland</u>, 466 U.S. at 687). The Supreme Court in <u>Strickland</u> has set forth a two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

<u>Strickland</u>, 466 U.S. at 687. As with any other claim under 28 U.S.C. § 2255, the burden of proving ineffective assistance of counsel is on a petitioner. <u>Gov't of V.I. v. Nicholas</u>, 759 F.2d 1073, 1081 (3d Cir. 1985).

The standard under the first prong of the <u>Strickland</u> test is that the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." <u>Strickland</u>, 466 U.S. at 688. A petitioner asserting a claim of ineffective assistance of counsel must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." <u>Id.</u> at 690. Courts must recognize the strong presumption that counsel has rendered adequate assistance and that all significant decisions were made in the exercise of reasonable professional judgment. <u>Id.</u> at 689; <u>see also</u> <u>Buehl v. Vaughn</u>, 166 F.3d 163, 169 (3d Cir. 1999); <u>Reese v. Fulcomer</u>, 946 F.2d 247, 256–57 (3d Cir. 1991); <u>United States v. Gray</u>, 878 F.2d 702, 710

(3d Cir. 1989).  The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential."  Kimmelman v. Morrison, 477 U.S. 365, 381 (1986).

The second prong of the Strickland test requires a petitioner to show that counsel's deficient performance prejudiced the defense.  Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."  Strickland, 466 U.S. at 691.  A petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694. Furthermore, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding" because "[v]irtually every act or omission of counsel would meet that test."  Id. at 693.

The Strickland Court further held that both prongs must be established in order to meet a petitioner's burden, and that if either prong is not satisfied the claim must be rejected, stating:

> Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.  Courts

should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

Id. at 697.

### B.   Petitioner's Claims

Petitioner's claims, exclusive of his citation to Strickland in each claim, are quoted

here:[4]

GROUND ONE:

Trial counsel's representation of the petitioner at trial was ineffective because he did not call witnesses on the petitioner's behalf including but not limited to:

(A)  James Yukna the head mechanic at Atlantic States who would have testified that the petitioner did not order him to repair the brakes on the forklift which was central to the Government's case against him.

(B)  Willie Ledee a cement liner foreman who would have testified that the petitioner did not order him to remove the shutoff limits on the cement mixer which was relevant to the Government's case against him.

(C)  Eric Hucklebee, Don Harbin, Mike Devine, plant managers at Alabama, New Jersey [sic: Birmingham, Alabama] who would have testified that the petitioner was untrained on OSHA, and environmental issues as part of his job design which was central to the Government's case against him; was also told he never needed to see a permit that Dan Yadzinski was in charge.

(D)  Mr. Wayne Smith who would have testified that the petitioner in Feb. 2000 told him what had happened at the Dec. 4th spill.  A statement which was contrary to the Government's version of events.

---

[4]  This text is quoted verbatim from Petitioner's second Section 2255 Motion (Dkt. 17), except that we have corrected obvious clerical errors without so noting.  We have also inserted the notation "[sic]" where an inadvertent drafting error appears to exist.

Had these witnesses and others been called at trial by defense counsel Mr.
Michael Critchley Sr. as demanded by the petitioner who was hired by the
Company to represent him at trial ... the petitioner's case would have been
made at the expense of the Company's interests, such a failure amounted to
clear effectiveness [sic] of counsel.

GROUND TWO:

Trial counsel's failure to put into evidence of Company lawyer Mr. John
O'Reilly's assurance to the petitioner that his conduct on the job was within
EPA, DEP and other safety standards.  Also clear conflict of interest since
Mr. O'Reilly hired Mr. Michael Critchley to represent him was ineffective
assistance of counsel, something that did not become apparent until the trial
was almost concluded.  The petitioner was advised by Mr. Critchley to
waive his right to conflict of counsel prior to trial despite the Government's
objection to Mr. Critchley.  Representation [sic] did not knowingly,
intelligently or voluntarily waive his right to such conflict role.
Representation [sic] since he not only was improperly advised to give up
such a right by that very same lawyer.  But also not advised in the law.

GROUND THREE:

Trial counsel failed to argue and contest the (4) level role enhancement for
acting in a leadership role level on the petitioner or to call witnesses on his
behalf on making argument was ineffective of counsel.

GROUND FOUR:

The following failures and ineffectiveness of (A) fully and properly advise
the petitioner of the circumstances under which a conflict of interest would
arise when the petitioner's defense conflicted with the Company's interests;
(B) fully and properly advise the petitioner of the options available to him
prior to trial including but not limited to cooperating against the interests of
the Company in return for a lesser sentence.

GROUND FIVE:

(A)  Eddie DeNoia was inexperienced for a case this complex and Mr.
Critchley was always sleeping and working on other cases in the courtroom.

11

(B)  Big concern through whole trial was they never told jury on all the incidents that I had two bosses making all the decisions.

(C)  Lawyer has nothing more to do with me after they promised to see me all the way through.  But when Company received a letter from my wife the lawyers contacted me right away.  The Company paid them 4 million dollars to protect the Company not me.

(D)  Asked the lawyers numerous times to take me in to talk with Government but told me it would do me no good.

GROUND SIX:

George Shepard's testimony was all lies.  Why was his awol issues not brought up.  And 2 different stories of the forklift incident.

The petitioner had bosses over him the General Manager, Vice President of Company, owner of Company.
     Dennis Charko
     Jim Singleton
Could not make any decision on his own without permission.  When all this came about in 1999 the petitioner was put in his position to take the fall.

GROUND SEVEN:

The petitioner never conspired to pollute water into the Delaware.

(Dkt. 17 at 4–19.)

We will address Petitioner's claims in light of the constitutional and statutory authorities set forth above.  To do so, we have organized his claims into the five subsections outlined below, because the allegations under the various numbered Grounds of his motion do overlap in part.  This discussion will draw upon specific portions of the record and additional case law as applicable.

### C.    Rulings on the Claims

####    1.    <u>Improper advice to waive conflict with co-defendant employer</u>

Petitioner appears to allege that he received ineffective assistance of counsel because the defendant Company, acting through its lawyer John O'Reilly, hired criminal defense attorney Michael Critchley to represent him, without advising him that it was a "clear conflict of interest since Mr. O'Reilly hired Mr. ... Critchley to represent him." (Dkt. 17 at 6.)  He also claims that Mr. Critchley rendered ineffective assistance of counsel because he was "advised by Mr. Critchley to waive his right to conflict of counsel [sic] prior to trial despite the Government's objection to Mr. Critchley."  (<u>Id.</u> at 6–7.)  For these reasons, according to Petitioner, he did not "knowingly, intelligently or voluntarily waive his right to such conflict role," -- apparently referring to the fact that the Company, a fellow defendant and Petitioner's employer, procured defense counsel for him and paid for that counsel throughout the prosecution and the appeal.  He argues, in sum, that "[t]he Company paid them 4 million dollars to protect the co. not me."  (<u>Id.</u> at 18.)

Respondent argues that this line of attack on Petitioner's conviction is foreclosed by the record, which establishes that Petitioner did make a knowing and voluntary waiver of his right to conflict-free counsel.  (Dkt. 9 at 7–11.)  The Court is constrained to agree with Respondent on this issue, based upon the detailed and thorough exploration of Petitioner's options on this key topic that the Court provided to him at the critical time in the underlying criminal case.

It is well-settled that a defendant can make a knowing and voluntary waiver of his right to conflict-free counsel.  Glasser v. United States, 315 U.S. 60, 70–71 (1942); United States v. Laura, 667 F.2d 365, 371–72 (3d Cir. 1981); United States ex rel. Hart v. Davenport, 478 F.2d 203, 211 (3d Cir. 1973); Gov't of V.I. v. Hernandez, 476 F.2d 791, 793–94 (3d Cir. 1973).  A knowing and voluntary waiver of a defendant's right to conflict-free representation will insulate a conviction from later attack on this ground. United States v. Flanagan, 679 F.2d 1072, 1075–76 (3d Cir. 1982), rev'd on other grounds, Flanagan v. United States, 465 U.S. 259 (1984); Noe v. United States, 601 F.3d 784, 791–92 (8th Cir. 2010); Gumangan v. United States, 254 F.3d 701, 705–06 (8th Cir. 2001); United States v. Martinez, 143 F.3d 1266, 1269 (9th Cir. 1998); United States v. Flores, 5 F.3d 1070, 1076–79 (7th Cir. 1993); United States v. Rodriguez, 982 F.2d 474, 477–78 (11th Cir. 1993); United States v. Straughter, 950 F.2d 1223, 1233–34 (6th Cir. 1991).

The issue of a potential conflict of interest for Petitioner's representation arose early in the case, as soon as the original indictment was filed.  It arose because Petitioner and each of his individual co-defendants were represented by criminal defense firms selected and compensated by their employer, the Company, which was a co-defendant under the same indictment.  The indictment was filed on December 11, 2003.  (Crim. Dkt. 1.)  At the initial appearance of all defendants before the Magistrate Judge on December 15, 2003, Mr. Critchley entered his appearance on behalf of Petitioner (Crim. Dkt. 11), as

did other attorneys on behalf of the other individual defendants.  (Crim. Dkts. 12–15.)  On that same day, the Government gave notice that it intended to move to disqualify each of those attorneys, and an early schedule was set for adjudication of those motions.  (Crim. Dkt. 2.)  This Court held oral argument on those motions on April 15, 2004, and an extremely thorough record was made at that time.  (See Crim. Dkt. 46.)

Prior to addressing the individual defendants at the motion hearing, the Court had appointed Lisa Van Hoeck, a seasoned and experienced Assistant Federal Public Defender, to meet with Petitioner and his fellow co-defendants "for the very limited purpose of reviewing with them the considerations that go into a knowing and voluntary acceptance of counsel under these circumstances and waiver of any potential conflict of interest relating simply to the counsel arrangement."  (Id. at 31–32.)  Attorney Van Hoeck met privately with the individual defendants as a group and reviewed with them the issues surrounding a potential conflict of interest.  (Id. at 34.)  Petitioner and his co-defendants had an opportunity to discuss individually with Ms. Van Hoeck any questions they had in regard to their right to conflict-free representation.  (Id.)

Petitioner testified to this Court that day, after conferring with independently appointed special counsel Van Hoeck.  He testified that he understood that he had a right to retain an attorney at his own expense to represent him in this case.  (Id. at 36.)  He testified that he understood that his employer, Atlantic States, was a co-defendant in this case that also faced criminal charges.  (Id.)  He testified that he understood that his trial

attorney, Michael Critchley, had been referred to him by counsel for Atlantic States.  (Id. at 37.)  He explained the circumstances under which he opted to retain Mr. Critchley to represent him.  (Id.)  He assured the Court that no one forced him in any way to use Mr. Critchley as his attorney for this case.  (Id.)  He testified that he understood that Atlantic States had agreed to pay Mr. Critchley to represent him.  (Id. at 37–38.)  He further testified that he understood that "because [his] attorney's fees are being paid by Atlantic States there's a possibility that Mr. Critchley's loyalties could be divided between [him] and Atlantic States[.]  That's what's called a potential conflict of interest."  (Id. at 38.)  He also testified that he understood that he could replace Mr. Critchley at his own expense, or at public expense if he qualified, if he was dissatisfied with Mr. Critchley's services on his behalf.  (Id. at 39.)

Significantly, during the colloquy between Petitioner and this Court in that court session on the record, Petitioner was informed by the Court and stated that he understood that "[i]f you think it's appropriate" he could "approach the Government and engage in plea negotiations without knowledge of any other person or Atlantic States.  You can privately approach the Government to open plea negotiations at any time."  (Id.)  The Court explained, and Petitioner acknowledged, the benefits he could potentially receive if he opted to cooperate with the Government.  (Id. at 39–40.)  The Court also explained the dangers that might arise if one of his co-defendants later opted to plead guilty and testify against him.  (Id. at 40.)  Petitioner acknowledged that he knew he had a right to consult

with another lawyer who had not been paid by any person or entity connected to his case

in regard to these matters.  (Id.)

Finally, this Court explained to Petitioner the consequences of a decision by him to

waive his right to conflict-free counsel. This Court stated, and Petitioner responded:

> Q.  And do you understand that at the conclusion of this case should you be
> found guilty you may not be able to complain or raise an argument at a later
> time that your attorney, Mr. Critchley, had a potential conflict of interest in
> that he was representing you but he was being paid by Atlantic States?
>
> A.  Yes.
>
> Q.  Are you willing to proceed in this case with Mr. Critchley and his firm
> as your counsel knowing all of these facts?
>
> A.  Yes.
>
> Q.  And are you so far satisfied with the advice and representation that Mr.
> Critchley and his firm are providing to you?
>
> A.  Yes.
>
> Q.  Okay.  Do you have any further questions before I conclude this?
>
> A.  No, Your Honor.

(Id. at 40–41.)

Based on those thorough and meticulous proceedings to protect Petitioner's rights

in the circumstances, as set forth in the undisputed record of the underlying criminal case,

this Court finds that it was entirely proper for the Court to accept Petitioner's free and

uncoerced choice of counsel, including his knowing, informed and voluntary waiver of

his right to conflict-free representation.  As the Court explicitly warned Petitioner during

that focused motion hearing initiated by the Government, "at the conclusion of this case should you be found guilty you may not be able to complain or raise an argument at a later time that your attorney, Mr. Critchley, had a potential conflict of interest in that he was representing you but he was being paid by Atlantic States[.]"  (Id. at 40.)  Nor did Petitioner at any later time during the lengthy progress of the criminal case, from that day forward through all the trial and appeal processes, ever seek to change his representation. Accordingly, the Court holds that the post-conviction claim of ineffective assistance of counsel based upon an alleged conflict of interest regarding Petitioner's trial and appeal counsel, Mr. Critchley and his firm, must be denied.

> 2.      Failure to protect Petitioner's interests rather than employer at trial

Petitioner makes generalized allegations to the effect that due to the alleged conflict of interest because his counsel was selected and compensated by the co-defendant Company, Mr. Critchley did not properly advise or vigorously defend him.  (See, e.g., Dkt. 17 at 10–11, 18.)  The Court has ruled, in Section II.C.1. supra, that any conflict of interest was knowingly and effectively waived by Petitioner, and may not form the basis of post-conviction relief in this case.  The remainder of Petitioner's assertions on this ground fall into three specific categories and a more general complaint about the quality of counsel's performance.  The three specific categories are addressed in the following three Sections of this Memorandum Opinion.  See Sections II.C.3., II.C.4., and II.C.5. infra.

The more generalized complaints lack substance and specificity, and are otherwise lacking in merit.  Conclusory allegations of ineffective assistance, unmoored to the facts of the case, do not support a claim of ineffective assistance of counsel or require an evidentiary hearing.  See, e.g., Palmer v. Hendricks, 592 F.3d 386, 394 (3d Cir. 2010); United States v. Thomas, 221 F.3d 430, 437 (3d Cir. 2000); Zettlemoyer v. Fulcomer, 923 F.2d 284, 298 & n.12 (3d Cir. 1991).

Petitioner's generalized complaints include counsel's alleged failure to "fully and properly advise the petitioner of the circumstances under which a conflict of interest would arise when the petitioner's defense conflicted with the Company's interests."  (Dkt. 17 at 20.)  However, the defense of both Petitioner and the Company throughout the trial was that neither the Company nor the individual defendants committed the acts of obstruction and environmental violation that were criminally charged.  In other words, as Mr. Critchley explained at the outset of the case, with the exception of some highly technical legal arguments such as definitions of mens rea, the defense posture of all the defendants in response to the charges was simply that they did not commit the crimes charged.  On that defense, the interests of the Company and the individual employees were precisely aligned.

Petitioner also asserts that "through the whole trial ... they [Mr. Critchley and his associate, Mr. DeNoia] never told jury on all the incidents that I had two bosses making all the decisions."  (Dkt. 17 at 18.)  The "two bosses" referred to in the Petition are stated

19

to be Dennis Charko and Jim Singleton.  (Id. at 19.)  Petitioner testified at trial, under
direct examination by his counsel, Mr. Critchley, that during the relevant time period, Mr.
Charko was his immediate supervisor as General Manager; and Mr. Singleton had been
promoted from General Manager to a higher corporate position supervising all of the pipe
manufacturing facilities of the parent company.  (Crim. Dkt. 1112 at 55–57.)  According
to his testimony thus elicited by Mr. Critchley, although Petitioner was Plant Manager, he
had relatively little decision-making authority; for example, he could only authorize
expenditures up to $1,000 without approval by the General Manager.  (Id. at 58–59.)

        To the extent that this argument is related to Petitioner's claim that his counsel
failed to oppose a supervisory role enhancement at sentencing, it is addressed in Section
II.C.4. infra.  If, on the other hand, it suggests that Petitioner was directed by his superiors
to commit the criminal acts for which he was found guilty, that would be inconsistent
with his own sworn denials at trial and would in any event not be exculpatory as to his
own guilt.  Competent defense counsel would surely have avoided any such finger-
pointing as a defense tactic at trial, especially because Atlantic States as a company was
also a named defendant, and Mr. Singleton was a named co-conspirator in the
Superseding Indictment.  (See Crim. Dkt. 95 at 16; Crim. Dkt. 717 at 38.)  As such, this
argument is subject to the "strong presumption" that "all significant decisions were made
in the exercise of reasonable professional judgment."  Strickland, 466 U.S. at 689.
Finally, if this argument is directed to Petitioner's claim that his counsel did not allow him

to try to cooperate with the Government and against the Company in hopes of obtaining a more lenient sentence, that subject is addressed in Section II.C.5. infra.

Addressing the conduct of his counsel at trial, Petitioner criticizes Mr. DeNoia as inexperienced and Mr. Critchley as inattentive.  However, those arguments likewise are unsupported by the record.  Mr. Critchley was – and is – a well-known, deeply experienced and highly respected federal criminal defense attorney in the District of New Jersey.  He filed numerous pretrial, trial, and post-trial motions, as well as appeal materials, that were well-written, well-researched and well-argued.  The docket of the underlying criminal case is replete with those filings, almost too numerous to count.  The Government presented a total of 52 witnesses during the approximately 7 1/2-month jury trial, and Mr. Critchley vigorously cross-examined virtually all of those witnesses in his client's defense.[5]  He also presented nine trial witnesses, and seven of those witnesses

---

[5]  Mr. Critchley personally conducted the cross-examination of the 34 trial witnesses presented by the Government who were cross-examined on behalf of Petitioner.  The Court has reviewed the testimony of all 52 Government witnesses, and it is clear that Mr. Critchley made reasonable strategic decisions not to cross-examine the other 18 Government witnesses for reasons of practicality (for example, witnesses who merely identified documents), or tactics (for example, witnesses who did not testify to facts relevant to the counts and overt acts charged against Petitioner, or witnesses whose cross-examination by counsel for other co-defendants covered all available impeachment material against those particular witnesses).  Here is a list of transcript citations to the first page only of the cross-examination by Mr. Critchley of those 34 Government witnesses.  We cite only the first page of each such reference for a given witness, because a reading of the transcripts (some on multiple days for a given witness) will indicate where his cross-examination of that witness was completed.  (See Crim. Dkt. 1019 at 15 (Barsony); Crim. Dkt. 1083 at 57 (Berberena); Crim. Dkt. 992 at 124 (Bobinis); Crim. Dkt. 1009 at 17 (Borger); Crim. Dkt. 1083 at 109 (Czapik); Crim. Dkt. 1016 at 118 (Decker); Crim. Dkt. 919 at 28 (Delker); Crim. Dkt. 906 at 4 (Doyle); Crim. Dkt. 957 at 98 (Fernicola); Crim. Dkt. 888 at 66 (Fleming); Crim. Dkt. 891 at 133 (Hay); Crim. Dkt. 1027 at 38 (Johnson); Crim. Dkt. 1087 at 154 (Kolbe); Crim. Dkt. 1016 at 4 (Kresge); Crim. Dkt. 995 at 164 (Lieberman); Crim.

were co-workers of Petitioner at the plant who offered exculpatory testimony in his favor on various fact issues.[6]  Altogether, the defense attorneys presented a total of 52 witnesses, including many more plant employees and several expert witnesses, and Mr. Critchley drew from those additional witnesses more points favorable to his client's defense when they testified.  (See, e.g., Crim. Dkt. 1132 at 202–03; Crim. Dkt. 1135 at 78–79 & 109–10.)  Mr. Critchley's summation to the jury was nothing short of extraordinary, when he demonstrated an encyclopedic command of the evidence and laid out his client's defense points in clear, logical, and persuasive words and presentation materials.  (Crim. Dkt. 570-1 at 165–214; Crim. Dkt. 572-1 at 4–100.)  His briefs and arguments at sentencing and on appeal were similarly comprehensive and highly skilled professional defense work, all as reflected in the voluminous docketed entries in the underlying criminal record.  (See, e.g., Crim. Dkt. 765 at 6–7 & nn.4, 5.)[7]  Also, as

---

Dkt. 885 at 156 (Mantoni); Crim. Dkt. 1036 at 128 (Marchan); Crim. Dkt. 970 at 156 (Marchand-Mendoza); Crim. Dkt. 887 at 83 (Morgan); Crim. Dkt. 979 at 51 (Owens); Crim. Dkt. 1013 at 4 (Redcay); Crim. Dkt. 1027 at 121 (Reid); Crim. Dkt. 932 at 45 (Rush); Crim. Dkt. 979 at 214 (Salerno); Crim. Dkt. 1173 at 40 (Schmeltzly); Crim. Dkt. 998 at 151 (Schultz); Crim. Dkt. 1059 at 24 (Shepherd); Crim. Dkt. 1087 at 93 (Silva); Crim. Dkt. 885 at 59 (Simonds); Crim. Dkt. 1075 at 193 (Tiedeman); Crim. Dkt. 1050 at 31 (Velarde); Crim. Dkt. 1024 at 183 (Vine); Crim. Dkt. 885 at 117 (Viscomi); Crim. Dkt. 1024 at 128 (Zettlemoyer).)

[6]  The testimony of the witnesses presented by Mr. Critchley on behalf of Petitioner, including the testimony of Petitioner himself, is contained in the trial record of the underlying criminal case.  (See Crim. Dkt. 1109 at 4–235; Crim. Dkt. 1112 at 5–224; Crim. Dkt. 1115 at 4–130; Crim. Dkt. 1118 at 4–189.)

[7]  The docket filing cited here, Crim. Dkt. 765, is a Memorandum Opinion filed by this Court in the underlying criminal action, addressing guideline sentencing calculation issues as to each of the defendants found guilty at trial.  That opinion is 372 pages long in the docketed version.  It is also published at 627 F.Supp.2d 180 (D.N.J. 2009), but we will cite to the docketed version here.

Respondent points out, as to Petitioner's complaint that Mr. DeNoia lacked the requisite experience for such a complex case, that cannot constitute a basis for collateral relief where, as here, Petitioner was represented by undeniably highly competent counsel in the person of Mr. Critchley, and Petitioner has not alleged how any lesser experience of Mr. DeNoia possibly prejudiced him.  (Dkt. 9 at 26.)[8]

3.    Failure to present some potential witnesses and arguments at trial

Petitioner contends that his trial counsel was ineffective for failing to present several potential witnesses and to advance some arguments in his defense at trial.  See Section II.B. supra.  Petitioner names the following persons, saying that they should have been called by his lawyer to testify:  (1) James Yukna, the head mechanic at Atlantic

---

[8]  Petitioner also claims in his Section 2255 motion that "Mr. Critchley was always sleeping and working on other cases in the courtroom."  (Dkt. 17 at 18; see also Dkt. 13 at 8.)  The Government responds:  "That allegation, however, is simply false.  As this Court is well aware, Critchley was awake, active, and vigorously representing Prisque throughout the trial.  Factual assertions that are flatly contradicted by the record are not a basis for collateral relief."  (Dkt. 9 at 26.)  The Court has considered this allegation most carefully, because there is federal appellate case law to the effect that such circumstances, if present, may justify a presumption of ineffective assistance of counsel, even without a showing of prejudice.  See, e.g., Burdine v. Johnson, 262 F.3d 336, 344–49 (5th Cir. 2001); Tippins v. Walker, 77 F.3d 682, 683–90 (2d Cir. 1996); Javor v. United States, 724 F.2d 831, 832–35 (9th Cir. 1984); see generally Wright v. Van Patten, 552 U.S. 120, 124–25 (2008) (comparing standards under Strickland and United States v. Cronic, 466 U.S. 648 (1984)); Bell v. Cone, 535 U.S. 685, 694–97 (2002) (same).  However, the Court must decline to grant relief on the basis of this allegation because all proceedings in the underlying criminal prosecution, including the entire trial, took place in the presence of the undersigned judicial officer and assigned court staff.  We observed firsthand the attentiveness and effectiveness of Petitioner's counsel Mr. Critchley throughout the lengthy jury trial, and during all prior and subsequent proceedings in this Court.  There simply is no factual basis to conclude that Petitioner was deprived of the attention and vigorous representation of his counsel for any extended time or during any portions of the proceedings that had relevance to his defense.  In fact, the record is to the contrary, as described and cited in this Memorandum Opinion.

23

States; (2) Willie Ledee, a cement liner foreman; (3) Eric Hucklebee, Don Harbin, and Mike Devine, described as plant managers in Birmingham, Alabama; (4) Wayne Smith, a criminal investigative agent for the state of New Jersey; and (5) John O'Reilly, Esq., counsel for the defendant Company.  Id.

Respondent correctly points out that Petitioner has not provided any affidavits from those persons summarizing the testimony they would have given at trial, which courts have generally expected to be presented in federal habeas petitions on such grounds.  (Dkt. 9 at 14 (citations omitted).)  Respondent also argues that "what little information [Petitioner] provides about these potential witnesses fails to raise a colorable claim of ineffective assistance of counsel."  (Id.)  This Court finds in favor of Respondent on this issue, based upon our review of the Petition and relevant portions of the underlying criminal case record.

Petitioner says that mechanic James Yukna should have been called as his defense witness because Yukna "would have testified that petitioner did not order him to repair the brakes on the forklift which was central to the Government's case against him."  (Dkt. 17 at 4.)  Respondent replies that:

> [T]he Government never contended that Prisque directly ordered Yukna to fix the brakes on the forklift.  In fact, the Government never attempted to prove the identity of the specific individual who fixed the forklift after the accident in which Al Coxe died.  The Government needed to prove only that the brakes were fixed after the accident and prior to OSHA's investigation in a deliberate attempt to mislead the OSHA investigators.  Because the Government did not attempt to prove that Yukna was personally responsible for fixing the forklift brakes after the accident, there is no reasonable possibility that his alleged

> testimony that he did not fix the brakes, or that Prisque did not order him to
> fix the brakes, would have changed the outcome of the case.

(Dkt. 9 at 14–15.)

This dispute refers to Counts 7, 9, and 10 of the Superseding Indictment, concerning alleged obstruction of an OSHA investigation involving a fatal accident in which a foreman was run over by a forklift at the plant.  Petitioner was one of the defendants named and convicted on Count 9 (as well as the related conspiracy allegation in Count 1).  (See, e.g., Crim. Dkt. 721 at 166–67.)  The trial evidence on Count 9 is described in detail, with citations to the trial record, in the post-trial Memorandum Opinion of this Court.  (Id. at 166–79.)  The Court of Appeals decision included a similar factual summary of the evidence on that Count.  See Maury, 695 F.3d at 240–41.  Based on the trial record, the Court finds that Respondent is correct that the Government never alleged or tried to prove that Petitioner instructed mechanic Yukna to fix the forklift after the accident, nor did the Government try to prove which person did fix the forklift so that it functioned properly when OSHA arrived.  For these reasons, the Court finds that this claim in the Petition does not satisfy the prejudice prong of Strickland, because even if Yukna had been called to testify, and assuming he would have said what Petitioner asserts, such testimony would not likely have changed the outcome on Count 9.

Next, Petitioner asserts that his trial counsel was ineffective for failing to call cement liner foreman Willie Ledee to testify on his behalf.  Petitioner states, without documentary support, that Ledee would have testified that Petitioner did not order him to

25

remove the electrical shutoff limits on the cement mixer that was involved in the accident where worker Hector Velarde lost three fingers while attempting to clean the inside of the machine.  (Dkt. 17 at 5.)

This dispute relates to Count 11 of the Superseding Indictment, charging that Petitioner and the Company altered the cement mixer to conceal that they had previously bypassed a safety device designed to shut down the mixer when its doors were opened. Petitioner and the Company were convicted on Count 11 (as well as the related conspiracy allegation in Count 1.)  (See, e.g., Crim. Dkt. 721 at 179–80.)   A review of the trial record reveals, however, that Petitioner cannot show prejudice on this claim.  Mr. Ledee was a witness at trial, called to testify by co-defendant Davidson.[9]  He was asked about those very facts.  Among other things, Ledee testified that the safety devices on the cement mixer doors (called "limit switches" or "safety switches") typically got "knocked off" and did not last long.  (Crim. Dkt. 1162 at 23.)  He said that the new cement mixer that arrived in 2000 originally had safety switches on it, but they were removed before he used it.  (Id. at 74.)  According to Ledee, he was not involved in the discussions on how

---

[9]  The defendants did not have a joint defense agreement.  In other words, each defendant was free to take any legal or factual position that might favor that defendant individually, regardless of its impact on the other defendants also on trial.  (See Crim. Dkt. 283 at 44.) However, to the degree that their interests in defending against various charges were common, they presented those defenses by calling various witnesses upon whom all could rely.  That was the situation when defendant Davidson presented Mr. Ledee as a witness, because in theory his testimony would be exculpatory as to both Davidson and Petitioner with respect to the Velarde incident.  Davidson was not named as a defendant on Count 11, but there was evidence that he was involved in the cement mixer situation.  He was charged in the obstruction objective of the Count 1 conspiracy, so he would have had the same interest as Petitioner and the Company to defend the allegations in Count 11.  (See generally Crim. Dkt. 721 at 179–92.)

26

those limit switches were removed.  (Id. at 79.)  This testimony by Ledee was therefore to the effect that Petitioner did not order Ledee to remove those safety switches.  To the degree that this testimony was exculpatory to Petitioner, it was presented at the trial by Ledee when he was called as a witness by Davidson, a defendant with a similar interest to that of Petitioner on that issue.  Therefore, Petitioner has shown no prejudice by the "failure" of his own counsel to call that witness.  See n.9 supra.

Petitioner also claims that his counsel should have called Messrs. Devine, Harbin, and Hucklebee, described as managers who worked for the parent company in Alabama, to testify that Petitioner as Plant Manager at Atlantic States did not receive OSHA or environmental training as part of his job, "which was central to the Government's case against him."  (Dkt. 17 at 5.)  This purported testimony, also not supported by documentation, would not have been reasonably likely to change the outcome of the trial for Petitioner.  See Hinton v. Alabama, 134 S.Ct. 1081, 1089 (2014) (to establish prejudice, defendant must show a "reasonable probability" that absent counsel's errors, "the result of the proceeding would have been different").

At no time during the prosecution did the Government argue that Petitioner, as Plant Manager, was familiar with all the details of the OSHA regulations or environmental permits.  As Respondent correctly states here, with respect to the obstruction counts of conviction, "[t]he notion that Prisque needed particularized training to know that he was not supposed to lie to or intentionally deceive government

27

investigators is simply untenable." (Dkt. 9 at 16 and n.2.) Likewise, with respect to the Clean Water Act and Clean Air Act counts of conviction, and the related Count 1 conspiracy allegations, no regulatory knowledge was needed beyond that which the evidence clearly showed Petitioner possessed. The Government's evidence at trial pointed to chronic plant conditions known to Petitioner that repeatedly polluted the public storm drain system, as well as deliberate actions by Petitioner to violate air emissions requirements of which he was well aware. (See, e.g., Crim. Dkt. 721 at 192–234, 246–63.) For these reasons, the Court finds that the Petition fails to show prejudice based upon counsel's failure to call those named individuals to testify to the training or lack of training afforded Petitioner on OSHA and environmental requirements.[10]

Petitioner also contends that his counsel should have called Wayne Smith to testify. He asserts (again without documentation) that Mr. Smith "would have testified that the petitioner in Feb. 2000 told him what had happened at the Dec. 4th spill. A statement which was controversy [sic: contrary] to the Government's version of events."

---

[10]  It is also to be noted that Mr. Devine was a supervisor working under Petitioner during at least part of the alleged conspiracy time frame, as was Donald Harbin. (See Crim. Dkt. 721 at 184 n.102.) They were both involved in the Velarde cement mixer OSHA obstruction. (Id. at 186–91.) In fact, Harbin was named in the Superseding Indictment as unindicted co-conspirator "Y" with reference to that incident, and the jury was so instructed at trial. (Id. at 180.) In addition, Mr. Devine was a convicted felon at the time, relating to his company work in Alabama, which conviction was only later reversed on appeal. (See Dkt. 9 at 15 n.3.) Therefore it would have been unlikely that those two individuals would have testified, even if called at trial by Petitioner's defense counsel. Rather, most likely they would have invoked their Fifth Amendment privilege not to testify. Experienced trial counsel for Petitioner surely was aware of that likelihood in making his decision not to call them as witnesses.

(Dkt. 17 at 5.)  First, this contention is extremely vague as to what Petitioner allegedly told Mr. Smith, and as such fails to meet Petitioner's burden of particularity under Section 2255.  It is well-settled that a court can dispose of vague or conclusory assertions in a petition as insufficient.  Machibroda, 368 U.S. at 495–96.  However, giving Petitioner as a pro se litigant a broad reading of this contention, Haines v. Kerner, 404 U.S. 519, 520–21 (1972), we will examine it in the context of the trial record.

Co-defendants Maury and Davidson, as well as the Company, were convicted on two false statement substantive counts, Counts 3 and 4.  (See Crim. Dkt. 721 at 139–49.) Those counts referred to statements allegedly made by Maury and Davidson to federal and state investigators during a search warrant execution at the plant on February 24, 2000, in connection with a discharge of oil-contaminated wastewater from the plant into the municipal storm drains flowing into the Delaware River that occurred on December 4–5, 1999.  According to the Government's evidence upon which those convictions were based, the cause of that discharge was intentional pumping of wastewater from the plant's "cement pit" water containment basin onto the ground, where it flowed into the storm drains.  During the search warrant execution, as charged in Counts 3 and 4 and as accepted in the jury verdict, Maury and Davidson used fabricated excuses – Maury saying that he believed the spill originated from a truck hydraulic line (Count 3), and Davidson saying that he believed the spill occurred because an outlet hose on a sump pump had a hole that leaked the water out.  (Count 4).  (Id.)  These two convictions were based on the

29

testimony of the investigating agents, Agent Fernicola as to Maury and Agent Hill as to Davidson, each accompanied by one other agent.  (Id.)[11]

Petitioner was not charged in a substantive false statement count as to that incident, but one of the five alleged objectives of the Count 1 conspiracy was to make false statements to federal officials (Crim. Dkt. 711 at 11–12); and one of the alleged overt acts of the conspiracy was that "[o]n ... February 24, 2000, [Petitioner] falsely told law enforcement officials that the discharge on December 4 and 5, 1999, was caused when a hole blew in the hose leading from a sump pump."  (Id. at 17.)  Petitioner was convicted on all five alleged objectives of that Count 1 conspiracy.  (See Crim. Dkt. 610 at 1.)

Agent Hill testified at trial that not only did he interview defendant Davidson, but he also was present when agents were asking Petitioner (who was the Plant Manager) what caused the December 4–5, 1999 incident.  According to witness Hill, "[Petitioner] told us that the incident was caused by a hole in the middle of the hose," referring to a sump pump used to pump water out of the cement pit.  (See Crim. Dkt. 948 at 35–37.)  Hill also testified that he, Hill, was introduced to Davidson by Hill's supervisor, Wayne Smith, and was instructed by supervisor Smith to do the interview of Davidson.  (See Crim. Dkt. 951 at 179.)

_____

[11]  There was federal jurisdiction for these counts, and for the corresponding alleged objective of the Count 1 conspiracy, because some of the investigating agents were federal such as FBI, and others were state environmental agents operating under Clean Water Act delegated federal authority.  (See, e.g., Crim. Dkt. 721 at 140, 145–46, 146 n.79, and 149.)

The Petition asserts that it was supervisor Wayne Smith who interviewed Petitioner, impliedly denying that Agent Hill did interview Petitioner.  (Dkt. 17 at 5.)  The Petition also asserts that if Wayne Smith had been called as a defense witness for Petitioner, Smith "would have testified that the petitioner ... told him what had happened at the Dec. 4th spill."  (Id.)  However, when Petitioner himself did testify in his own defense at the trial, he merely stated that it was Smith who interviewed him, with no other persons nearby, and that Hill never interviewed him.  (Crim. Dkt. 1115 at 68–70.)  He did not volunteer on direct testimony what he allegedly told Smith at that time, nor did he do so when asked on cross-examination about the conversation he alleged took place between himself and Wayne Smith.  (Id.; Crim. Dkt. 1118 at 97–99.)  Given the fact that his trial posture was to deny that he spoke to Agent Hill, and further to deny that he made the alleged false statements to supervising Agent Smith – without testifying to his version of what he did say to Agent Smith – it can hardly be said that Petitioner's defense counsel was ineffective for deciding not to call Agent Smith as a trial witness.  Here, based on the record, the Court must apply the "strong presumption" that the decision of Petitioner's experienced trial counsel not to call Agent Smith as a witness was "made in the exercise of reasonable professional judgment."  Strickland, 466 U.S. at 689.  Therefore, this contention fails to satisfy the performance prong of the Strickland test.

The last contention in this group of claims is that Petitioner's trial counsel failed to offer "evidence of Company lawyer Mr. John O'Reilly['s] assurance to the petitioner that

his conduct on the job was within EPA, DEP and other safety standards."  (Dkt. 17 at 6.)

As previously stated, Attorney O'Reilly was corporate counsel for the Company prior to

issuance of the indictment in the underlying criminal case, and he served as defense

counsel for the Company throughout the prosecution and appeal, after separate defense

counsel had been retained for each of the individual defendants including Petitioner.  See

Section II.C.1. supra.  The first problem with Petitioner's contention that legal opinions

given by Attorney O'Reilly to him should have been placed in evidence at trial is that to

have done so would have opened the door for the Government to argue that Petitioner had

thereby waived any attorney-client privilege between himself and Attorney O'Reilly prior

to retention of his separate counsel.  This could then have exposed Petitioner to a

thorough recapitulation, at trial, of all the discussions he had with Attorney O'Reilly that

would otherwise have been protected by that privilege.  Experienced defense counsel such

as Mr. Critchley would hardly have inflicted that consequence on his client by attempting

to call Mr. O'Reilly as a defense witness for Petitioner at trial.

　　　　Even more fundamentally, however, Petitioner cannot seriously contend that Mr.

O'Reilly was made aware of known safety or environmental violations or accident cover-

up conduct by Petitioner, and yet advised him that it was legally proper.  As Respondent

states this principle, "it is highly implausible that O'Reilly or any attorney informed

Prisque that it was acceptable to, for example, pollute the environment, remove safety

devices from equipment, to lie to and otherwise attempt to deceive Government

investigators, and to order his subordinates to engage in such behavior." (Dkt. 9 at 16.) Thus, it is reasonable that either Petitioner did not reveal misconduct to Attorney O'Reilly, or Mr. O'Reilly did not advise Petitioner that the alleged criminal conduct was acceptable. Either way, the argument that Petitioner's defense counsel should have called Mr. O'Reilly to testify, or evidence of his legal advice to Petitioner should have been presented at trial, fails on the performance prong of Strickland.

Respondent also points out in this connection that defendants called as trial witnesses three other attorneys who each performed environmental legal services regarding Company operations at the plant: Anthony Reitano, John Fetterly, and Kathleen Caminiti. (Id. at 18; see Crim. Dkt. 1145 at 102–208.) Although the topics covered by each of them varied slightly, the implication of their testimony was that, at least in the environmental compliance area, defendants' conduct was guided by the Company's attorneys. Respondent argues, and this Court agrees, that there is no reason to find, based on Petitioner's vague and conclusory allegations, that the thrust of Mr. O'Reilly's testimony would have been anything other than cumulative of the testimony elicited from those witnesses. (Dkt. 9 at 18–19.) Accordingly, the Court finds that this contention of the Petition also fails to satisfy the prejudice prong of Strickland.

For the reasons stated in this Section, the Court finds that the Petition fails to meet the burden of establishing constitutionally ineffective assistance of counsel with respect to Petitioner's arguments that his counsel should have called the following potential

witnesses to testify in his defense: (1) James Yukna, (2) Willie Ledee, (3) Eric Hucklebee, Don Harbin, and Mike Devine, (4) Agent Wayne Smith, and (5) Attorney John O'Reilly. To the extent that the Petition contends that other persons should also have been presented as defense witnesses (see Dkt. 17 at 4), those vague assertions may not form the basis of relief under Section 2255.  Machibroda, 368 U.S. at 495–96.[12]

4.      Failure to argue against upward role adjustment at sentencing

Petitioner also claims that his trial counsel "failed to argue and contest the (4) level role enhancement for acting in a leadership role ... or to call witnesses on his behalf" in making that argument.  (Dkt. 17 at 9.)  If true, that allegation could support relief under Section 2255.  See, e.g., United States v. Otero, 502 F.3d 331, 337 (3d Cir. 2007) (defendant received ineffective assistance when counsel failed to object to a particular enhancement in the PSR); Jansen v. United States, 369 F.3d 237, 244 (3d Cir. 2004) ("where defense counsel fails to object to an improper enhancement under the Sentencing Guidelines, counsel has rendered ineffective assistance.").   However, in this case, as Respondent accurately replies, "[in] written submissions to this Court, and in oral argument at the sentencing hearing, defense counsel vigorously contested" the application of that enhancement.  (Dkt. 9 at 20.)

---

[12]  Petitioner's Reply Brief lists an additional sixteen names of individuals whom he suggests should have been called as defense witnesses at trial, further contending that "there was a litany of potential witnesses that would have provided testimony that would have supported Movant's defenses."  (See Dkt. 13 at 3–5, citing id. at 13–23 (investigator work product, summary of interviews).)  The Court has reviewed these further materials, but finds them insufficient to carry the burden on either the performance or the prejudice prong of Strickland as to those uncalled witnesses.

The chronology of the sentencing proceedings in the underlying criminal case was extremely protracted because of the numerous defendants, counts of conviction, and guideline and non-guideline issues to be addressed by the parties and ultimately decided by this Court. Essentially, each convicted defendant contested each calculation in the original draft of the Presentence Report, and many of those disputes were issues of first impression in sentencing under the obstruction statutes and the Clean Water Act and Clean Air Act.

The briefing and presentations by both sides on sentencing were truly extensive. Petitioner was ultimately sentenced on April 20, 2009, having remained on bail since the jury verdict was rendered on April 26, 2006. (See Crim. Dkts. 610, 760.) Thus, almost three full years elapsed between verdict and sentencing, owing to the volume of the trial evidence, the extensive post-trial motions, and the numerous sentencing issues. This Court issued its 271-page Memorandum Opinion on the post-trial motions for acquittal and new trial on August 2, 2007. (Crim. Dkt. 721.)[13] Immediately thereafter, the parties were permitted to begin submitting sentencing briefs on schedules determined by the Court. As of February, 2008, there were numerous sets of sentencing briefs, including opening and reply briefs from each of the convicted defendants and responsive briefing by the Government.

---

[13] The briefing materials filed by the parties on the Rule 29 and Rule 33 post-trial motions alone totaled approximately 595 pages, exclusive of appendices and exhibits. (See Crim. Dkt. 765 at 7 n.5; Crim. Dkt. 721 at 130.)

On February 6, 2008, this Court heard a full day of oral argument by those parties, including Petitioner, directed solely to the guidelines issues including offense level calculations and potential departures.  (Crim. Dkt. 738.)  Based on those submissions and arguments, this Court prepared, and provided to the parties on December 31, 2008 (but did not simultaneously docket), a 372-page Memorandum Opinion setting forth its tentative rulings on those sentencing issues.  (See Crim. Dkt. 765 at 6.)  Thereafter the parties were permitted to submit additional sentencing materials, and the sentencing hearings were completed during one week in April, 2009.  The individual sentencing hearing for Petitioner was conducted on April 20, 2009.  (Crim. Dkts. 760, 783.)  Thereafter, the Court docketed an updated version of its previously-drafted sentencing Memorandum Opinion on April 30, 2009 ("Sentencing Opinion").  (Crim. Dkt. 765.)  See n.7 supra.  This elaborate sentencing procedure thus afforded counsel for each of the defendants, including Petitioner, a full opportunity to advocate exhaustively on behalf of their individual clients, as well as collectively, on issues common to all or specific to each of them; and they fully utilized that opportunity.

As noted in our Sentencing Opinion, by February, 2008, the sentencing briefs by all parties totaled approximately 650 pages, and those briefs were all directed to guidelines calculations and potential grounds for guidelines departures.  (Crim. Dkt. 765 at 7 n.5.)  Of those, approximately 215 pages were submitted by counsel for Petitioner, in three separate briefs with exhibits.  This Court refers to those briefs as Prisque I (dated

October 12, 2007), Prisque II (dated December 21, 2007), and Prisque III (dated February 21, 2008).  (Id.)  In addition, at the oral argument on the guidelines calculation disputes conducted in this Court on February 6, 2008, counsel for Petitioner argued the guidelines issues raised in those briefs, including the guidelines leadership role enhancement issue, and made a PowerPoint presentation containing 28 slides, of which 11 slides addressed that issue.  (See Crim. Dkt. 738 at 33–40, 168–70; Crim. Dkt. 1262.)

The subsequent sentencing briefs filed by Petitioner's counsel, again pursuant to scheduling directives of this Court, addressing the remaining sentencing issues under the sentencing statute, 18 U.S.C. § 3553(a), will be referred to as Prisque IV (letter brief dated March 23, 2009), Prisque V (sentencing memorandum dated March 23, 2009), and Prisque VI (reply sentencing memorandum received in chambers April 16, 2009). Sentencing briefs are not customarily filed on the docket, but in order to address the issue raised in the pending Petition regarding counsel's advocacy during the sentencing phase, the Court has filed those briefs (and the related PowerPoint slides) on the docket of the underlying criminal case under seal, so that they are preserved in the electronic case file system.[14]  Here we cite the specific locations in counsel's many sentencing materials

---

[14]  Sentencing memoranda by parties are not routinely docketed in this Court.  That practice was followed in Petitioner's criminal case, and all sentencing submissions from all parties were submitted to chambers rather than filed on the public docket.  (See Crim. Dkt. 765 at 2 n.3.)  In preparing this Memorandum Opinion addressing Petitioner's pending Section 2255 motion, the Court has directed the Clerk to file, under seal in the underlying criminal case, the chambers copies of the sentencing briefs and exhibits submitted by Petitioner's counsel.  (See Crim. Dkts. 1258, 1260–1263, & 1265–1267, consisting of: Order to File Under Seal dated Jan. 14, 2016; brief dated Oct. 12, 2007 (Prisque I); reply brief dated Dec. 21, 2007 (Prisque II); letter brief dated Feb. 21, 2008 (Prisque III); letter brief dated Mar. 23, 2009 (Prisque IV); brief dated

submitted for Petitioner where any guidelines role enhancement for him was vigorously disputed, and indeed a minor role reduction was requested.  (See Crim. Dkt. 1260 at 77–78, 127–36; Crim. Dkt. 1261 at 49; Crim. Dkt. 1262 at 11–21; Crim. Dkt. 1266 at 4–7, 19–21; Crim. Dkt. 1267 at 6–7.)

This Court made a searching analysis of the role adjustment issue during the sentencing process.  That analysis was so detailed that it was included in the written Sentencing Memorandum circulated to the parties on December 31, 2008, and docketed on April 30, 2009, immediately after the sentencing of all defendants was concluded. (Crim. Dkt. 765.)  It consumes 40 pages in the Sentencing Memorandum, with specific factual findings as to Petitioner's role enhancement as well as regarding other convicted defendants, each individually.  (Id. at 91–130.)  Counsel for Petitioner correctly chose not to attempt to re-argue the role enhancement issue on the final sentencing hearing date of April 20, 2009, because all of that advocacy had previously been presented to the Court in writing in counsel's many sentencing briefs (see n.14 supra) and at the sentencing hearing oral argument on February 6, 2008.  Instead, on the record during the sentencing hearing on April 20, 2009, counsel simply stated -- and this Court agreed -- that all of his

---

Mar. 23, 2009 (Prisque V); reply brief received Apr. 16, 2009 (Prisque VI); and 28-page PowerPoint slide set presented by Petitioner's counsel at oral argument on February 6, 2008. The same order to file also filed under seal the pertinent versions of Petitioner's Presentence Report as prepared by the U.S. Probation Office.  (See Crim. Dkt. 1258 at 2; Crim. Dkts. 1259 & 1264.)

arguments in opposition to the guideline calculations made by the Court were to be preserved.  (Crim. Dkt. 783 at 9–20.)

Petitioner's objections to the role enhancement applied by this Court at sentencing were indeed preserved on behalf of Petitioner by his counsel, who then proceeded to appeal that ruling, among many others, to the Court of Appeals and argue that issue in his briefing materials on appeal.  See 3d Cir. No. 09-2345, 2-2-11 Proof Brief On Behalf Of Appellant John Prisque at 31–37; id., 10-31-11 Joint Proof Reply Brief On Behalf Of Appellants at 69–73 (concerning Petitioner's individual arguments); id., 12-15-11 Brief On Behalf Of Appellant John Prisque at 31–36.  The decision of the Court of Appeals recognized that the defendants, including Petitioner, appealed on many issues including "the District Court sentencing determinations."  See United States v. Maury, 695 F.3d 227, 233 (3d Cir. 2012) (published appeal decision).  That decision set forth the sentence that each convicted defendant received, including Petitioner, and the fact that the sentencing decisions were being challenged on appeal.  Id. at 246–47.  The Court of Appeals decision then discussed a host of issues raised by the parties on appeal, but did not include a discussion of the sentencing issues.  Instead, at the end of the discussion, the Court of Appeals decision concluded that "[h]aving carefully considered the Defendants' various remaining arguments, we find them to be without merit."  Id. at 267.  Accordingly, the Court of Appeals affirmed all of the convictions and sentences, "in all respects."  Id.

A review of the written and oral advocacy of Petitioner's counsel, as contained in the docket of the underlying criminal case, clearly demonstrates that counsel objected vigorously to an upward guidelines offense level leadership role adjustment under USSG 3B1.1 for his client, whether for four points or for any points.  (See Crim. Dkt. 783 at 34–89.)  See n.14 supra and accompanying text.  He made similar efforts on behalf of Petitioner on appeal.  Based on that strenuous effort and the many evidentiary facts in the record as cited by Petitioner's defense counsel, this Court concludes that there is no basis upon which to find any deficiency on the performance prong of Strickland as to that issue.  Therefore, although in Petitioner's Reply Brief he contends that "the issue regarding the misapplication of a four (4) level enhancement can be corrected and at minimal expense to all parties" (Dkt. 13 at 10), this Court simply has no legal authority to grant a modification of his sentence so as to eliminate the effect of that role enhancement.

### 5.   Failure to advise about plea options

Petitioner also asserts that motivated by a conflict of interest, his counsel did not "fully and properly advise the petitioner of the options available to him prior to trial including but not limited to cooperating against the interests of the Company in return for a lesser sentence." (Dkt. 17 at 10–11; see also Dkt. 1 at 10–11.)  In that connection, Petitioner also states that he "asked the lawyers numerous times to take me in to talk with Government but told me it would do me no good." (Dkt. 17 at 18.)  These allegations

relate to the time "prior to trial," as Petitioner states, and may also refer to the time period when the trial was in progress, although that is unclear as stated in the Petition.

Respondent replies that these allegations are waived because they are part of the conflict of interest claim waiver that permitted Mr. Critchley and his firm to represent him, and that Petitioner was told by the Court at the time of his waiver of the potential conflict between his interest in cooperating and the interests of the Company, which was paying his legal fees.  (Dkt. 9 at 27.)  However, in the view of the Court, these allegations must be considered despite the fact that we have found Petitioner's waiver of the inherent conflict of interest to have been knowing and voluntary.  See Section II.C.1.

"Defendants have a Sixth Amendment right to counsel, a right that extends to the plea-bargaining process....  During plea negotiations defendants are 'entitled to the effective assistance of competent counsel.'"  Lafler v. Cooper, 132 S.Ct. 1376, 1384 (2012) (citations omitted).  Where a plea offer is rejected and the defendant proceeds to trial and is convicted, to establish prejudice as a result under Strickland a petitioner must "show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court ..., that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that ... were imposed."  Id. at 1385.  Even when a defendant receives no plea offer or only an unacceptable plea offer, an ineffectiveness of counsel claim may be premised on a failure of counsel to

advise that an open plea could be entered. See, e.g., United States v. Booth, 432 F.3d 542 (3d Cir. 2005) (remanding for a hearing based on such allegations). Of course, in each instance to prevail on such claims, a petitioner would have to show prejudice, in the sense that a petitioner would have chosen to plead guilty rather than to proceed through trial, and that the result for a petitioner would have been better than it was after trial. Lafler, 132 S.Ct. at 1385.

When addressing a contention regarding plea bargaining, as well as in general the advice of defense counsel leading to the decision whether or not to proceed to trial, the District Court generally lacks a foundation in the record of the underlying criminal case because those deliberations take place out of the presence of the court. In these circumstances, at the pleadings stage of the Section 2255 case, if the allegations are not clearly frivolous, "we must accept the factual allegations in [the] petition as true." Day, 969 F.2d at 42 (citing Forte, 865 F.2d at 62).

This Court finds, again construing Petitioner's pro se allegations liberally, Haines, 404 U.S. at 520–21, that this particular claim is not frivolous on its face and it cannot be adjudicated on the records and files before the Court. Those records contain no information on whether plea negotiations took place, or what discussions Petitioner had with his counsel prior to trial and/or during the trial on the subject of a possible negotiated plea or even an open plea. See, e.g., Fed.R.Crim.P. 11(c)(1) ("An attorney for the

government and the defendant's attorney ... may discuss and reach a plea agreement.  The court must not participate in these discussions.").

The Court finds, for these reasons, that the factual issues raised in the Petition regarding Petitioner's decision to proceed through trial rather than to plead guilty, with or without a plea agreement, must be resolved by an evidentiary hearing.  United States v. Tolliver, 800 F.3d 138, 140–43 (3d Cir. 2015); Day, 969 F.2d at 44–47.  The next steps will be to appoint counsel for Petitioner; allow a counseled petition or declaration to be filed; and then conduct the hearing as soon as practicable after giving the attorneys adequate time to investigate, conduct any necessary discovery, and prepare.  Id. at 46–47; Rule 8.  The discovery and hearing will be limited to the issues identified in this Section (II.C.5.) of this Memorandum Opinion.

## III.    CONCLUSION

The Court concludes that based upon the papers filed by the parties in this action, as well as the record of the underlying criminal action (Criminal No. 03-852), as cited and discussed in this Memorandum Opinion, Petitioner has not met his burden of establishing a claim of ineffective assistance of counsel under 28 U.S.C. § 2255 as to the following contentions:

1.    Improper advice to waive conflict with co-defendant employer (see Section II.C.1. supra);

2.     Failure to protect Petitioner's interests rather than employer at trial (see Section II.C.2. supra);

3.     Failure to present certain potential witnesses and arguments at trial (see Section II.C.3. supra); and

4.     Failure to argue against upward role adjustment at sentencing (see Section II.C.4. supra).

The Court finds that as to the contention that Petitioner received ineffective assistance of counsel by failing to advise him about plea options, an evidentiary hearing will be conducted upon appointment of counsel for Petitioner pursuant to Rule 8(c).

The Court has reviewed the other allegations in the Petition and finds them to be without merit and not requiring further discussion, for the reasons stated in the Respondent's Opposition Brief.  (See Dkt. 9 at 28–29.)

An appropriate Order accompanies this Memorandum Opinion.

  s/ Mary L. Cooper          
**MARY L. COOPER**
United States District Judge

**Dated:** January 19, 2016